**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02399-STV

JENNIFER BETH HEGUY,

     Plaintiffs,

v.

UNLEADED SOFTWARE, INC., and
NANCY J. CLARK

     Defendant.

_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**
_____

Magistrate Judge Scott T. Varholak

     This matter came before the Court for trial on May 6-9, 2019. The parties have consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. [##15, 16] At the conclusion of the trial, the Court took the matter under advisement. Having fully reviewed the evidence presented, applicable law and arguments of counsel, the Court now enters its Findings of Fact, Conclusions of Law and Order.

**I.     PROCEDURAL BACKGROUND**

     Plaintiff initiated the instant action on October 4, 2017. [#1] Plaintiff's Amended Complaint asserts four causes of action related to Plaintiff's employment and ultimate termination from Defendant Unleaded Software, Inc. ("Unleaded"). [#30] Claims One and Three allege discrimination by Unleaded on the basis of sex and pregnancy, in violation of Title VII (Claim One) and Colorado Revised Statute § 24-34-402 (Claim

1

Three).  [*Id.* at 8-9, 10-11]  Claim Two alleges retaliation by Unleaded in violation of Title VII.  [*Id.* at 9-10]  Claim Four alleges aiding and abetting discrimination by Defendant Nancy Clark, in violation of Colorado Revised Statute § 24-34-402.[1]  [*Id.* at 11-12] Plaintiff's Amended Complaint seeks back and front pay, lost employment benefits, compensatory and punitive damages, attorneys' fees and costs, and pre-judgment and post-judgment interest, among other relief.  [*Id.* at 12-13]

On April 4, 2019, the parties filed a Stipulation to Withdraw Jury Demand and Try Matter to Court.  [#46]  A bench trial commenced on May 6, 2019, and concluded on May 9.  [##54, 56-57, 59]  At the conclusion of trial, the Court took the matter under advisement.  [#59]

## II. FINDINGS OF FACT

Unleaded is a website design company created by Jarod Clark in the mid-1990s. By 2010, Unleaded had approximately thirty employees.  At all times relevant to the lawsuit, three individuals held an ownership interest in Unleaded—Jarod Clark, who held the largest interest; Nancy Clark, who is Jarod's mother[2]; and Andrew Klein.

On August 4, 2010, Unleaded hired Plaintiff to work as a project manager and agreed to pay her a $40,000 salary.  Plaintiff has an Associate's Degree from Platt College.  As a condition of her employment, Plaintiff signed a non-compete agreement

---

[1] Plaintiff's original Complaint brought an aiding and abetting claim against both Defendant Nancy Clark and her son, Jarod Clark.  [#1 at 11-12]  Pursuant to a stipulation, Plaintiff dismissed Jarod Clark as a defendant in this matter.  [#27]

[2] For simplicity, and because several members of the Clark family were involved in both work at Unleaded and the events giving rise to the instant litigation, the Court refers to the individual members of the Clark family by their first names.

that limited her ability to solicit Unleaded customers for a period of eighteen months following her termination. [Ex. 11]

Plaintiff was initially very successful at Unleaded. After a few months, she received a $10,000 raise. She was then promoted to Project Manager Director, and her base salary was raised to $57,000 per year. She also began receiving commissions. By 2014, as a result of her base salary and commissions, her annual gross income from Unleaded was approximately $107,000. By all accounts, from the time she was hired through July 2014, Plaintiff was a valued Unleaded employee. Both Jarod and Nancy praised Plaintiff's work.

At the end of 2013, rather than requesting a raise, Plaintiff asked to change her work schedule. Specifically, she asked to work a four-day, ten-hour per day, workweek. She would not work on Wednesdays, though she indicated that she would be available on that day. Nancy agreed to the change.[3]

Despite the change in schedule, Plaintiff was still putting in long hours and felt stressed and overwhelmed. As a result, at some point between late May and early July 2014, Plaintiff approached Unleaded's ownership about working part-time. She met with Nancy who was open to the idea and asked Plaintiff to put together a proposal.

On July 21, 2014, Nancy sent Plaintiff an email with an attached proposal for the part-time position. [Ex. M] This began a series of emails between Plaintiff and Nancy concerning the details for the part-time position.[4] [Exs. N-S] Among the issues discussed were the compensation structure, the number of hours worked, and whether Plaintiff

---

[3] For ease of future reference, the Court refers to this schedule as the "flex schedule."
[4] Nancy and Plaintiff also met in person on July 25, 2014, to discuss the part-time position. [Ex. R]

would retain the title of Project Manager Director or simply become a project manager. Plaintiff also wanted Unleaded to transition the job of assigning tasks and projects to somebody else. [Ex. S at Bates US 1439-40] Plaintiff proposed her own version of the part-time job description on July 28, 2014. [*Id.* at 1439-40, 1261-70] In an August 11, 2014 email, Plaintiff stated that she was hoping to have the part-time position finalized by the end of the week, so that she could begin at the start of the next pay period. [*Id.* at Bates US 1439]

On August 18, 2014, Nancy sent Plaintiff an email setting forth a revised proposal for the part-time position. [Ex. X at Bates US 1421] In it, Nancy proposed a $35 per hour base salary, limited to 24 hours per week. [*Id.*] Travel to Rite Aid's corporate headquarters, located in Pennsylvania, however, would not be included as part of that hourly compensation. [*Id.*] Rite Aid was one Unleaded's largest clients. Plaintiff responded later that day that she "w[ould] need to be compensated for all hours worked." [*Id.* at Bates US 1420]

Nancy responded a few hours later. In an email to Plaintiff, she stated that what Plaintiff "brought up with all hours being compensated is essentially the issue [Nancy] feared—[Plaintiff] taking a managerial role and overlying it with the 'Taco Bell' hourly filter." [*Id.*] Nancy further indicated that while Unleaded was willing to accommodate Plaintiff's request for health insurance and vacation, she did not "see that [Unleaded] can fill a managerial position on a part time compensation package" and that this problem "[wa]s a problem [she] c[ouldn't] overcome." [*Id.*] As a result, she indicated that she was "back to either or in that it's either a [project manager] role part-time or a [Project Manager Director] role full-time." [*Id.*] Plaintiff and Nancy exchanged two more emails later that

day, both indicating that there had been a "disconnect" between them in their previous discussions about the part-time position.  [*Id.* at Bates US 1419]

On August 25, 2014, Plaintiff sent an email to Nancy, Jarod, and Mr. Klein, advising them for the first time that she was pregnant and expecting in April 2015.  [Ex. A-21]  She stated that Unleaded's handbook did not have details on maternity leave, and she inquired how leave would work.  [*Id.*]  In response, all three Unleaded owners sent congratulatory emails.  [Exs. A-22-A-24]

The next day, Nancy sent Plaintiff an email explaining that she had spent the last week meeting with Jarod and different division managers about the part-time position.  [Ex. Y at Bates US 1413]  The email then detailed a revised proposal.  [*Id.*]  As part of the proposal, Plaintiff would continue to oversee project managers, but she would no longer assign projects for the overall group.  [*Id.*]  She would continue to manage the projects for the key clients that Plaintiff had previously requested.  [*Id.*]  She would work 24 hours per week.  [*Id.* at Bates US 1414]  Her base salary would be "$3360/month (this is $35/hour, 24 hours a week)."[5]  [*Id.*]  Plaintiff would also receive commissions for her project manager work, upsells, and sales to new customers.  [*Id.*]  She would also have health insurance and six national holidays.  [*Id.*]

Plaintiff responded to Nancy and Jarod Clark with an email stating that they "seem[ed] [to be] aligning on the role but they [we]re still not aligning on the compensation."  [Ex Z]  Nancy responded with an email asking Plaintiff to explain what was not aligned.  [Ex A-1]  A series of email exchanges ensued.  [Exs. A-2-A-11]  Plaintiff

---

[5] This number appears to be calculated by multiplying $35 per hour by 24 hours per week, and then multiplying that number by four weeks per month.

questioned whether she would receive vacation pay, paid personal leave, and paid holidays. [Ex. A-4] Plaintiff also explained that she thought the salary calculation was incorrect. [*Id.*] Plaintiff explained that "$35 x 24 hours = $840 x 52 weeks =$43680 / 12 months = $3640." [*Id.*] Plaintiff and Nancy apparently ultimately agreed on the leave policy for the new position, but did not further discuss the base salary calculations. [Exs. A-5-A-12]

On September 4, 2014, Plaintiff sent an email to Nancy and Jarod stating that she believed the move to part-time employment as discussed between the parties "would be a good transition." [Ex. A-12] She further indicated that she would like to start on September 15, the beginning of the next pay period. [*Id.*] She then asked Nancy to send the paperwork so that she could "look it over for a final signature." [*Id.*]

Nancy responded with an email stating that she would be sending the paperwork over that morning. [Ex. A-13] She further indicated that they had started the part-time position two days earlier, because a start date at the beginning of the month eliminates confusion.[6] [*Id.*] When Plaintiff responded stating that she did not want the part-time position to start until September 15, Nancy replied that Plaintiff was "not in charge of th[e] time decision." [Ex. A-14]

A series of terse emails ensued. [Exs. A-15-A-17] Plaintiff said that she was "not sure why every step of this [negotiation process] [wa]s turning into a battle." [Ex. A-15] Nancy responded by agreeing that the "battle part [was] nonsense" and accused Plaintiff of "attempting to manage the business in a manner that [wa]s outside of [her] purview."

---

[6] September 1, 2014 was Labor Day and Unleaded's office was closed.

[Ex. A-16]  Plaintiff replied that Nancy had been showing "very obvious hostility" since July when the part-time negotiation process began.  [Ex. A-17 at Bates US 1332]

Plaintiff reviewed the proposed terms for the part-time position, which included the September 2 start date, and continued to reflect a base salary of $3,360 per month.  [*See id.* at Bates US 1331]  Plaintiff emailed Nancy, stating that she could not "sign the[] documents," because the salary was wrong and the parties could not agree on the start date.  [*Id.*]

A few hours later, Plaintiff met with Nancy's daughter, Shaun Clark, on September 4, 2014.  Shaun is a lawyer by training, though she was not licensed during the events in question.  Nonetheless, she would perform some in-house lawyering services for Unleaded.  During the meeting, Plaintiff explained that the proposed compensation was improperly calculated and that she could not start the new position on a day that had already passed.  As a result, she declined the part-time position.

A few hours after that meeting, Shaun sent Plaintiff an email stating that she was "glad [the parties] got everything worked out" during the meeting.  [Ex. A-18 at Bates US 0433]  In that email, Shaun informed Plaintiff of three changes that would be made to the full-time Project Manager Director position, which Plaintiff would be retaining.  [*Id.*]  First, Plaintiff would no longer be in charge of reviewing Active Collab, a project management software.  [*Id.*]  Second, Plaintiff would no longer need to manage project assignments.  [*Id.*]  Plaintiff testified that these first two changes were changes that she desired.

Finally, Shaun's email stated that Plaintiff's flex schedule would be eliminated and she would be required to work five days a week, for eight hours per day.  [*Id.*]  Nancy, Jarod, and Shaun all credibly testified that the proposed elimination of the flex schedule

was the result of productivity problems Unleaded experienced when Plaintiff was out of the office, and the Court concludes that productivity was the reason for the proposed change in schedule. Plaintiff was unhappy with this final proposed change.

In response, Plaintiff sent Shaun an email that same day, stating that she had been on the flex schedule for over a year and had not had any reason to believe it was not working. [*Id.* at Bates US 0434] She further stated that she could "only assume this [schedule change] [wa]s because of the negotiation to the part time position [and] because [she was] pregnant." [*Id.*] She said she felt that she was "being discriminated against ever since [she] told management [she] was pregnant." [*Id.*] She indicated that she had told Shaun during the meeting that she felt the "work environment [wa]s hostile" and that she was "being treated differently." [*Id.*] She concluded by stating that Unleaded could not fire or reassign her because she was pregnant, and that she hoped Unleaded would rectify the situation before she had to file a complaint. [*Id.*]

Shaun forwarded Plaintiff's email to Nancy and Jarod, with a statement that she would "deal with this." [*Id.*] Nancy responded in an email telling Shaun Clark to "[b]eware of the conversation vs. email," and stating that "[e]mail is all that matters in a lawsuit, as you know memory of conversations holds no value." [Ex. 28 at Bates US 0174]

On September 5, 2014, Shaun responded to Plaintiff's email accusing Unleaded of discrimination. [Ex. A-19 at Bates US 0198] She explained that Unleaded was not attempting to fire or reassign Plaintiff, and that Unleaded was "very happy to have [Plaintiff] at the full-time position." [*Id.*] She further explained that Unleaded was "truly impressed with the quality of work that [Plaintiff] ha[d] put in over the years." [*Id.*] Finally, she informed Plaintiff that the changes to the position were not designed to discriminate

against Plaintiff, but were the result of a "need to constantly improve [Unleaded's] process." [*Id.*]

Plaintiff responded by thanking Shaun for the "kind words," saying that they "help[ed] considering all the negativity and hostility [Plaintiff had] been shown over the past several weeks." [*Id.* at Bates US 0197] Plaintiff further agreed with the first two changes to her position—transitioning responsibility for project management assignments and Active Collab review to other employees—stating that they were items that she "too ha[d] been saying for quite some time should change." [*Id.*] Nonetheless, she continued to express dissatisfaction with the elimination of the flex schedule, and stated that she still believed that she was being discriminated against. [*Id.*]

After some discussion, Unleaded's owners decided that Plaintiff could retain the flex schedule. On Monday, September 8, Shaun sent Plaintiff an email confirming that Plaintiff could continue working ten-hour days, four days per week. [Ex. A-20] In that email, Shaun reiterated that Unleaded was "very pleased with the work [Plaintiff] ha[d] done." [*Id.*] She also requested a meeting "to discuss any other concerns [Plaintiff] might have." [*Id.*] Shaun and Plaintiff did meet and Shaun asked Plaintiff to identify a specific situation where Plaintiff had been discriminated against. Plaintiff could not identify any specific instances, and said everything would be alright provided things went back to normal.

Because of the part-time negotiations and Plaintiff's discrimination accusation, Plaintiff's relationship with Nancy deteriorated. Nancy testified credibly that she was frustrated by the part-time negotiations. She believed that she was being flexible and

trying to make the part-time position work. But, each time she felt they had reached an agreement, Plaintiff made additional demands.

Nancy further testified that she was surprised by the discrimination accusation. She admitted that she kept her distance from Plaintiff because she was concerned that Plaintiff would make new allegations. Plaintiff and two of her co-workers from that time-period likewise testified to reduced verbal communications between Plaintiff and Nancy.

On September 12, 2014, Plaintiff completed a performance appraisal form. [Ex. J] In it, she was highly critical of Unleaded's management. [*Id.*] For example, she said that her past quarter had been good financially, "but working with owners on schedule was bad and [she] still fe[lt] hostility." [*Id.*] She further indicated that she "really dislike[d] the management style from the owners." [*Id.*] Nancy testified that she found this appraisal form the most insulting self-appraisal form she had seen in her more than forty years in the workplace.

Nancy, Shaun, and Jarod all testified credibly that Plaintiff's attitude and performance also declined, perhaps beginning as early as July 2014. Nancy testified credibly that Plaintiff's insubordination began after the part-time negotiations broke down, and Shaun described two specific instances in late 2014 where Plaintiff was disrespectful and dismissive. In addition, in December 2014, another Unleaded employee reported to Nancy that Plaintiff had been belligerent to him. The Court finds that Plaintiff's attitude deteriorated significantly once the negotiations for part-time employment broke down.

Jarod testified credibly that Plaintiff's relationship with her customers declined and that Rite Aid, Unleaded's largest customer, asked for a replacement project manager. On September 9, 2014, Jarod sent Plaintiff an email stating that Unleaded had received

five complaints from customers about the project managers.  [Ex. A-27]  He explained that the status quo was not working and that they needed to "shift into crisis mode and effect positive change ASAP."  [*Id.*]  Two days later, Jarod sent another email to Plaintiff stating that they had received a complaint from Rite Aid.  [Ex. A-28]

In addition to the customer complaints, Jarod testified credibly that he had received comments from other employees that Plaintiff's communication style was causing conflict. Additionally, Jarod testified credibly that projects were getting behind.  Nonetheless, Jarod believed that these performance problems could be coached or corrected.

On January 2, 2015, Nancy sent Plaintiff an email stating that Unleaded was changing its policy about working from home.  [Ex. 41]  In the email, Nancy informed Plaintiff that Unleaded would no longer allow employees to work from home.  [*Id.*]  She explained that the change was the result of two of Plaintiff's absences.  [*Id.*]  Nancy testified that Plaintiff had not declared that she was working from home on those two days until long after the absences, and those incidents prompted the policy change.

In February 2015, Plaintiff did not receive her paycheck at the same time as all other Unleaded employees.  She asked Jarod about this, and he stated that they were reviewing her commissions.  The review had been initiated when another employee brought the commissions to Nancy's attention because the claimed commissions were significantly higher than any of Plaintiff's previous commissions.  This was the first time Plaintiff's commissions had ever been questioned.  When Plaintiff received her paycheck on the evening of February 16, 2015, her commissions had been reduced.

Upon seeing that her commissions had been reduced, Plaintiff went to Nancy's office to ask about the reduction.  Jarod testified that this initial meeting occurred around

5:00 p.m., and the Court finds that testimony credible. In that initial encounter, Nancy told Plaintiff that she had sent an email about the commissions. That email, sent by Nancy at 5:57 p.m. on February 16, 2015, states that "[d]uring a recent audit of commission reports [Unleaded has] found that [Plaintiff has] overcharged [her] commission in several areas ongoing for many months." [Ex. A-34] It further asserts that "[e]ither by error, or negligence the reporting was overstated," and that "[i]n the future such ongoing overstatements will be considered fraud and Unleaded will take corrective action up to and including termination for cause." [*Id.*]

Following receipt of this email, Plaintiff returned to Nancy's office, where Nancy, Shaun, and Jarod were present. Each of the four participants testified about this meeting, giving different versions of what occurred. The Court finds Jarod's description of the meeting most credible.[7] Plaintiff positioned herself in a manner that blocked Nancy's exit from the room. Plaintiff said that she wanted to be paid her commissions and that Nancy was simply jealous. Nancy told Plaintiff that she was so mad that she wanted Plaintiff to leave. Plaintiff refused, saying she wanted to be paid her commissions. Both Nancy and Plaintiff were loud and talking over each other, though Plaintiff's voice was the loudest Jarod had ever heard inside the building. Finally, Shaun told Plaintiff that she needed to leave, and Plaintiff left.

---

[7] Christine Rhoades, Plaintiff's former co-worker and friend, testified that she was sitting outside the room where the meeting occurred, and could hear tones but not words. Ms. Rhoades testified, however, that she was outside the room at 5:00 p.m., and it is undisputed that the email that led to the second meeting was not sent until 5:57 p.m. [Ex. A-34] It is possible that Ms. Rhoades was seated outside the first meeting, which Jarod testified took place around 5:00 p.m. In any event, the Court finds Jarod's description of the second meeting most credible.

Jarod testified credibly that this was the single most disturbing incident he had ever experienced in the workplace. He was concerned about the safety of his team. Whereas he had believed that Plaintiff's other performance issues could be coached or corrected, he did not believe that this incident was correctable. He, Nancy, and Shaun had a brief discussion, and decided that they needed to terminate Plaintiff. They decided to terminate her at the end of the next day to avoid another explosion in the workplace.

Shaun drafted a termination letter. In the letter to Plaintiff, Shaun wrote that Plaintiff's "conduct in the office of Unleaded Group on 2/16/15 has resulted in your termination." [Ex. 26] Prior to Shaun providing Plaintiff with the letter, but after the incident on the evening of February 16, Plaintiff sent an email to Unleaded's owners and Shaun stating that her due date was approaching and that she would be seeking maternity leave. [Ex. 29] It does not appear that Plaintiff received a response to that email.

At the end of the workday on February 17, 2015, Shaun asked Plaintiff to come to her office. When Plaintiff arrived, Shaun, Nancy, and Jarod were all present. Shaun gave Plaintiff the termination letter, thereby terminating Plaintiff's employment with Unleaded.

Following her termination, Plaintiff submitted a claim for unemployment with the Colorado Department of Labor and Employment ("DOL"). [Ex. 39 at Bates 443] In a March 4, 2015 response to DOL's request for facts regarding Plaintiff's termination, Unleaded informed DOL that Plaintiff was terminated for rude or offensive behavior, insubordination, and other reasons. [*Id.* at Bates 444] In an attachment to that response, Unleaded stated that, beginning in July 2014, Plaintiff had been warned multiple times about performance and behavioral issues. [*Id.* at Bates 445] The attachment then details several such incidents. [*Id.*]

In a follow-up letter to DOL, Nancy stated that Plaintiff's "increasingly rude and offensive behavior and insubordination in the workplace was disruptive to the ongoing operations of Unleaded and undermined the continuum of work performed by multiple departments, affecting Unleaded's workflow and thus profitability." [Ex. 38 at Bates 426] The letter further stated that Plaintiff refused to perform certain Active Collab work and inadequately trained the new trainee who was going to be taking over the Active Collab responsibilities. [*Id.*] The letter further detailed an additional incident in which Nancy believed that Plaintiff's job performance was deficient. [*Id.*] The letter concluded by indicating that "[n]ine out of 10 communications were tension filled over the last many months. It stopped work progress and affected Unleaded's growth." [*Id.* at Bates 427]

On May 26, 2015, Unleaded, through counsel, provided a response to Plaintiff's charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC"). [Ex. 2] In the response, Unleaded once again stated that Plaintiff was terminated for insubordination, as well as rude and offensive behavior. [*Id.*] In addition, however, Unleaded stated that Plaintiff "submitted a commission report which overstated the commissions earned and due." [*Id.*]

## III.   CONCLUSIONS OF LAW

Claims One and Three of Plaintiff's Amended Complaint allege discrimination by Unleaded on the basis of sex and pregnancy, in violation of Title VII (Claim One) and Colorado Revised Statute § 24-34-402 (Claim Three). [#30 at 8-9, 10-11] Claim Two alleges retaliation by Unleaded in violation of Title VII. [*Id.* at 9-10] Claim Four alleges aiding and abetting discrimination by Defendant Nancy Clark, in violation of Colorado Revised Statute § 24-34-402. [*Id.* at 11-12] The Court addresses each claim below.

**A.     Claim Ones and Three: Discrimination on the Basis of Sex and Pregnancy in Violation of Title VII (Claim One) and Colo. Rev. Stat. § 24-34-402 (Claim Three) by Defendant Unleaded**

Plaintiff alleges that Defendant Unleaded intentionally discriminated against her with respect to the terms, conditions, or privileges of her employment, because of her sex and her pregnancy, in violation of Title VII and the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-402.  [#30 at ¶¶ 68, 90]  Title VII states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "[A]n unlawful employment practice is established," if Plaintiff can demonstrate that her sex "was a motivating factor for any employment practice, even though other factors also motivated the practice."  *Id.* § 2000e-2(m).  Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy.  *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1343 (2015).  Under 42 U.S.C. § 2000e(k), employers must treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  Likewise, under CADA it is unlawful "to discharge . . . or to discriminate in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of . . . sex."  Colo. Rev. Stat. § 24-34-402(1)(a).

Plaintiff can prove a discrimination claim based on her gender and pregnancy "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]."  *Young*, 135 S. Ct. at 1345.

The Colorado Supreme Court also has adopted the Supreme Court's analysis in *McDonnell Douglas* to evaluate claims of employment discrimination under CADA. *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399-401 (Colo. 1997). Here, in the absence of evidence that Defendant terminated Plaintiff explicitly because of her sex and her pregnancy,[8] Plaintiff must rely upon the *McDonnell Douglas* test. "A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Comm'cns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

Plaintiff has established her prima facie case here. She is a member of a protected class and she was terminated from her position. Moreover, the termination occurred while she was pregnant, and hours after Plaintiff requested maternity leave. Such circumstances give rise to an inference of discrimination. *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (holding, in retaliation context, that "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference").

Because Plaintiff has established her prima facie case, there is a presumption of discrimination, and "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action." *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

---

[8] Plaintiff acknowledged in both opening and closing statements that there was no direct evidence of discrimination.

133, 142 (2000). At this stage, Unleaded "is required only to explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Jones*, 349 F.3d at 1260 (quotation omitted). Here, Unleaded has stated that Plaintiff was terminated due to her aggressive and unprofessional actions on February 16, 2015. This is a legitimate, nondiscriminatory reason for Plaintiff's termination.

Because Unleaded demonstrated a valid, non-discriminatory reason for the adverse employment action, the burden shifts back to Plaintiff to show that Defendant's articulated reason was pretextual. *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999). To find for Plaintiff, the Court as factfinder would need to find by a preponderance of the evidence that Plaintiff's sex and her pregnancy "actually motivated" Defendant's decision, and had a "determinative influence on the outcome." *Martinez v. Abraham*, No. 03-662 WPJ/ACT, 2004 WL 7337530, at *3 (D.N.M. Nov. 12, 2004) (second quoting *Reeves*, 530 U.S. at 141); *see also Martinez v. U.S. Dep't of Energy*, 170 F. App'x 517, 524 (10th Cir. 2006). "The relevant inquiry is not whether defendants' proffered reasons are correct, but whether defendants 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1214 (D. Kan. 2003) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)), *aff'd*, 101 F. App'x 782 (10th Cir. 2004). Plaintiff may demonstrate pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Bullington*, 186 F.3d at 1317 (quotations omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

The Court concludes that Plaintiff has not made this showing. Nancy, Jarod and Shaun each testified that Plaintiff's conduct during the February 16 meeting was unacceptable and the reason for her termination. Both Nancy and Jarod testified that it was the worst behavior they had ever seen in the workplace. The Court finds the Clarks' testimony on this issue credible.

In support of her claim for pretext, Plaintiff points to alleged inconsistencies in the various rationales Unleaded has provided for her termination. Plaintiff points to the fact that her termination letter only listed her February 16 conduct as grounds for her termination. [Ex. 26] Nonetheless, Unleaded provided additional grounds for Plaintiff's termination in their correspondence with the DOL and the EEOC. [Exs. 2, 38, 39]

Certainly, inconsistencies in an employer's proffered reasons for discharge can cause a factfinder to conclude that the proffered reasons were pretext for discrimination. *Bullington*, 186 F.3d at 1317, 1318 n.15; *see also Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) (holding jury could find pretext where employer's asserted rationales for the termination were later affirmatively disclaimed "in the face of contrary testimony from its own management"). Here, however, the details Unleaded provided to the DOL and the EEOC were consistent with the trial testimony. Nancy and Jarod both testified about Plaintiff's performance and behavioral issues that began around July 2014, specifically describing many of the incidents presented to the DOL and the EEOC. Nancy testified that she nonetheless did not wish to terminate Plaintiff because it would be expensive to train a new employee. Jarod similarly testified that he did not wish to terminate Plaintiff because he believed the performance issues were coachable. But following the February 16 incident, both Nancy and Jarod concluded that the situation

had become unworkable, and that Plaintiff needed to be terminated. Again, the Court finds their testimony on that issue credible.[9] Accordingly, the Court concludes that Plaintiff has not demonstrated pretext. The Court will therefore enter judgment in favor of Defendant Unleaded on Claims One and Three.

### B. Claim Two: Title VII Retaliation by Defendant Unleaded

Plaintiff also alleges that Unleaded retaliated against her in violation of Title VII. Title VII makes it unlawful to retaliate against an employee for opposing employment practices made unlawful by the statute. 42 U.S.C. § 2000e-3(a). To prevail on a Title VII retaliation claim, a plaintiff must establish, including by presenting direct evidence, "that retaliation played a motivating part in the adverse employment decision." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (quotation omitted). "If the plaintiff can prove that retaliatory animus was a motivating factor, the burden then shifts to the employer to demonstrate that it would have taken the same action absent the retaliatory motive." *Id.*

Alternatively, a plaintiff may proceed under the burden-shifting framework established by *McDonnell Douglas*. *Id.* Under that framework, "the plaintiff must first establish a prima facie case of retaliation by showing (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection exists between the

---

[9] Moreover, even if Nancy and Jarod had testified that Plaintiff's job performance had also contributed to the decision to terminate Plaintiff, the Court could find that Plaintiff's job performance "at most . . . constitute[d] a supplemental reason for . . . termination." *Twigg v. Hawker Beechraft Corp.*, 659 F.3d 987, 1002 n.9 (10th Cir. 2011). "Nothing in the [Tenth Circuit's] jurisprudence prohibits an employer from relying on more than one nonretaliatory reason for terminating an employee." *Id.*

protected activity and the materially adverse action." *Id.* (quotations omitted). Once the plaintiff asserts a prima facie case, the burden shifts to the employer to proffer a legitimate, non-retaliatory rationale for the materially adverse action. *Id.* If the employer does so, then the plaintiff must show that the "proffered rationale is pretextual." *Id.* (quotations omitted).

Regardless of whether a plaintiff proceeds with direct proof or pursuant to *McDonnell Douglas*, to plausibly plead a Title VII retaliation claim the plaintiff must allege that she suffered a materially adverse employment action—one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). This is a more liberal standard than the adverse employment action standard applied in Title VII's anti-discrimination context. *Id.* at 61-70. But "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68.

Here, Plaintiff alleges several retaliatory actions in response to her September 2014 complaint about discrimination. These include Nancy's reduced communication with Plaintiff and instruction to Shaun to communicate with Plaintiff via email, the three changes to her job position outlined in the September 4 email, heightened job scrutiny, the initial withholding of Plaintiff's commissions and ultimate failure to fully pay those commissions in February 2015, and finally Plaintiff's termination from her employment. The Court addresses each of these below.

### 1. Nancy's reduced communication with Plaintiff and instruction to Shaun to communicate with Plaintiff via email

Plaintiff asserts that Nancy limited her communication with Plaintiff following Plaintiff's report of discrimination and instructed Shaun to communicate with Plaintiff via email. Nancy admitted to the former and an email confirms the latter. The problem for Plaintiff, however, is that these changes do not rise to the level of a materially adverse employment action, especially given the lack of testimony from Plaintiff that these reduced communications somehow impacted Plaintiff's job performance.[10] *Steele v. Kroenke Sports Enters.*, 264 F. App'x 735, 746 (10th Cir. 2008) (holding supervisor's decision to communicate with plaintiff through intermediary, and instruction to co-employee not to join plaintiff on smoking breaks, were not materially adverse employment actions); *Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1195 (D. Kan. 2011) (finding supervisor's decrease in communication with employee following employee's filing of EEOC charge was not an adverse employment action, but instead "constitute[d] a petty slight, or minor annoyance"). Accordingly, the Court finds that these changes in employment are not actionable.[11]

---

[10] While not mentioned during closing as an adverse employment action, Plaintiff also testified that her desk was unexpectedly moved. Once again, however, Plaintiff did not explain how this move impacted her job performance and, as a result, the Court concludes that the relocation of Plaintiff's desk is the type of petty insult that is not actionable. *See Stone v. Mukasey*, No. 06-cv-00364-WDM-MJW, 2008 WL 1883548, at *7 (D. Colo. Apr. 25, 2008) (holding, even under more liberal standard for adverse employment actions in retaliation context, movement to a smaller office did not constitute an adverse employment action). Moreover, Nancy credibly testified that the move was the result of a re-shifting of the office, not in response to Plaintiff's discrimination complaint.

[11] To the extent Plaintiff alleges these changes occurred as a result of her pregnancy, they likewise fail to constitute adverse employment actions and, as a result, cannot form the basis for a pregnancy discrimination claim.

## 2.  The September 4 job changes

Plaintiff also argues that the three changes to her position proposed by Shaun in her September 4, 2014 email were the result of unlawful retaliation.  There are several problems with this argument.  First, the September 4 email proposing the changes was sent *before* Plaintiff complained about discrimination.  [Ex. A-18]  Indeed, her complaint about discrimination was in response to Shaun's email.  [*Id.*]  Second, the first two job changes were changes that Plaintiff sought and desired.  Thus, those changes were not the type of materially adverse employment action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Finally, Nancy, Jarod, and Shaun all credibly testified that the final change eliminating the flex schedule was the result of efficiency concerns, not because of any discrimination.  And, in any event, the schedule change was never implemented.  Thus, the Court concludes that the September 4 job changes do not support a retaliation claim.[12]

## 3.  Heightened job scrutiny, commissions, and ultimate termination

Finally, Plaintiff argues that, because of her claim of discrimination, she was subjected to heightened job scrutiny, a delay and withholding in her commissions, and ultimate termination.  Because Plaintiff lacks direct evidence of retaliatory motive, she must proceed pursuant to the *McDonnell Douglas* framework.

---

[12] To the extent Plaintiff alleges these changes occurred as a result of her pregnancy, her claim still fails.  While the September 4 email did occur shortly after Plaintiff's pregnancy announcement on August 25, the first two changes were changes Plaintiff desired and the third change was never implemented.  And again, Nancy, Jarod, and Shaun testified credibly that the schedule change was the result of efficiency concerns, not because of any discrimination.

It is undisputed that Plaintiff engaged in protected activity by complaining about alleged discrimination.  The Court likewise concludes that heightened job scrutiny, the delay and withholding of commissions, and termination all could constitute materially adverse employment actions.  The issue, therefore, is whether Plaintiff can establish causation, as required for a prima facie retaliation claim.

Plaintiff must establish "a causal connection between her protected conduct and the adverse employment action by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *Unal v. Los Alamos Pub. Schs.*, 638 F. App'x 729, 741-42 (10th Cir. 2016) (quotation omitted).  But "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."  *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (alterations in original) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).  "A six-week period between protected activity and the adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."  *Id.*

With respect to heightened job scrutiny, it is true that Jarod sent two emails expressing concern about Plaintiff's job performance shortly after Plaintiff raised her complaint of discrimination in September 2014.[13]  [Exs. A-27, A-28]  But, the emails also

---

[13]  In her closing argument, Plaintiff also suggested that the fact that Unleaded's management took seriously the allegation of misconduct made by another employee against Plaintiff, but did not take seriously Plaintiff's allegation of discrimination, demonstrates either heightened scrutiny or unfair treatment.  There was no testimony, however, that management treated the allegations against Plaintiff differently than it treated similar allegations against similarly situated employees.  *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (plaintiff may establish disparate treatment by

indicate that they were sent in response to complaints raised by customers on the days the emails were sent. [*Id.*] Moreover, Jarod credibly testified that Plaintiff's performance was declining and that he was receiving increased complaints from customers. The Court concludes that any increased scrutiny over Plaintiff's work was the result of Plaintiff's declining performance and not the result of the discrimination complaint.[14]

With respect to the delay and withholding of Plaintiff's commissions in February 2015, that conduct occurred five months after Plaintiff's claim of discrimination on September 4, 2014. Given this delay, Plaintiff needed to present additional evidence beyond temporal proximity to prove that the delay and withholding of commissions was in retaliation for Plaintiff's complaint of discrimination. *Meiners*, 359 F.3d at 1231. She failed to do so.

Moreover, Nancy credibly testified that the issue of commissions was brought to her attention by another employee. The claimed commissions significantly exceeded any prior commissions earned by Plaintiff, and Nancy honestly believed that Plaintiff had overstated her commissions. Even if Nancy was mistaken, and Plaintiff correctly stated her commissions, that honest mistake does not support a finding of retaliation. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1210-11 (10th Cir. 2007).[15]

---

showing that she was treated differently than a similarly situated employee). Moreover, Plaintiff's complaint of discrimination was directed at the owners—and particularly Nancy—who did not believe that they were acting in a discriminatory manner. Nonetheless, Shaun testified credibly that she met with Plaintiff and asked Plaintiff what actions were discriminatory, and Plaintiff could not identify any discriminatory actions. Plaintiff fails to describe any further steps Unleaded should have pursued to "investigate" Plaintiff's discrimination claims.

[14] For the same reasons, to the extent Plaintiff claims the heightened job scrutiny was the result of her pregnancy, that claim fails.

[15] For the same reasons, to the extent Plaintiff claims the delay and withholding of her commissions was the result of her pregnancy, that claim fails.

Finally, Plaintiff's termination occurred five months after she complained of discrimination.  Thus, as with the delay and withholding of commissions, Plaintiff needed to present additional evidence beyond temporal proximity.  Once again, she has failed to do so.  Moreover, for the reasons detailed in addressing Plaintiff's discrimination claims, the Court concludes that Nancy and Jarod's testimony concerning the reason for Plaintiff's termination was credible, and that Plaintiff was terminated in response to her actions on February 16, 2015, and not in response to her complaint of discrimination.  The Court will therefore enter judgment in favor of Unleaded on Claim Two.

### C. Claim Four: Violation of Colo. Rev. Stat. § 24-34-402 by Defendant Nancy Clark

Plaintiff alleges that Defendant Nancy Clark violated Colorado Revised Statute § 24-34-402 by aiding and abetting the alleged discrimination and retaliation.  Under § 24-34-402(1)(e)(I), it is unlawful to "aid, abet, incite, compel, or coerce the doing of any act defined in this section to be a discriminatory or unfair employment practice."  As detailed above, the Court has concluded that there was no discrimination or retaliation.  The Court will therefore enter judgment in favor of Nancy Clark on Claim Four.

## IV.    CONCLUSION

Based on the foregoing, the Court finds in favor of Defendant Unleaded on Claims One through Three and in favor of Defendant Nancy Clark on Claim Four.  Accordingly, it is **ORDERED** that the Clerk of Court shall enter judgment in favor of Defendants Unleaded and Nancy Clark and against Plaintiff Jennifer Heguy.

DATED:  May 17, 2019                              BY THE COURT:


                                                                   s/Scott T. Varholak_____
                                                                   United States Magistrate Judge